**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| MICHAEL B. WHEELER, | : | CIVIL ACTION NO. 13-2557 (MLC) |
| | : | |
| Petitioner, | : | **MEMORANDUM OPINION** |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Respondent. | : | |
| | : | |

**COOPER, District Judge**

Michael B. Wheeler files a motion to vacate, set aside or correct his sentence

pursuant to 28 U.S.C. § 2255 ("Motion").  (See dkt. 1.)  This Court will deny the Motion,

and will decline to issue a certificate of appealability.

**FACTUAL AND PROCEDURAL HISTORY**

Wheeler was deployed as a lieutenant colonel in the United States Army Reserve

to Iraq on active duty to serve the Coalition Provisional Authority ("CPA") in October

2003.[1]  He was appointed Deputy Chief of Staff and Deputy Civil Administrator for CPA

---

[1] The United States, the United Kingdom, and other members of the Coalition Forces
formed the CPA in May 2003 to temporarily govern Iraq.  The United Nations Security Council
passed a resolution recognizing the legitimacy of the CPA soon thereafter, and mandated that it
"promote the welfare of the Iraqi people through the effective administration of the territory".
See S.C. Res. 1483, ¶ 4, *352 U.N. Doc. S/RES/1483 (May 22, 2003).  The CPA carried out the
mandate for the next 14 months by administering humanitarian programs and reconstruction
projects.  The CPA drew on funding from: (1) United States congressional appropriations; and
(2) the Development Fund for Iraq ("DFI").  See United States ex rel. DRC, Inc. v. Custer
Battles, LLC, 562 F.3d 295, 298–99 (4th Cir. 2009).  The CPA was given discretion in spending
DFI's funds.  See S.C. Res. 1483, ¶ 13 (noting "funds in the [DFI] shall be disbursed at the
discretion of the [CPA]").  The CPA was replaced by the Interim Government of Iraq on June 28,
2004.  See United States v. Whiteford, 676 F.3d 348, 351–52 (3d Cir. 2012).

South Central Region ("CPA-SC"), and was responsible for recommending reconstruction projects, expediting CPA payments to contractors, and confirming that CPA-sponsored projects were satisfactorily completed.  See Crim. No. 07-76, dkt. 18, Indictment at 5.[2] Wheeler was convicted of conspiracy under 18 U.S.C. § 371 for participating in a bid-rigging scheme to direct millions of dollars in contracts to companies owned by American businessman Philip Bloom.  This Court had jurisdiction pursuant to 18 U.S.C. § 3231.

Australia, Denmark, Italy, Japan, the United States, the United Kingdom, and other members of the Coalition Forces provided staff to the CPA.  The United States provided active-duty service members, including reserves, and civilians.  Members of the American armed forces assigned to the CPA were bound by the Uniform Code of Military Justice, which applies "in all places".  10 U.S.C. §§ 802(a)(1), 805.  Military officers also were bound by Part 2635 of Title 5 of the Federal Code of Regulations, which specifies "standards for ethical conduct" for Executive Branch employees.  See 5 C.F.R. § 2635.101(c).  Part 2635 extends to those "on detail" to an international organization, unless they are specifically exempted.  See 5 C.F.R. § 2635.104(c).  Officers are "employees" of the Department of Defense ("DoD") bound by, and face penalties if they deviate from, Part 2635.  See 5 C.F.R. § 2635.102(h) ("Employee ... includes officers but not enlisted members of the uniformed services"); see also 5 C.F.R. §§ 2635.106(a),

---

[2]  The five regions of the CPA were each run by a Regional Coordinator.  The CPA-SC comprised 50% of the land mass and 48% of the population of Iraq, and included the cities of Karbala and al-Hillah.

3601.101.  Wheeler and a co-defendant, Curtis Whiteford, were both officers in the United States Army Reserve.  See Whiteford, 676 F.3d at 352.[3]

The CPA issued rules, memoranda, and orders carrying legal force in Iraq.  See http://www.iraqcoalition.org/regulations/.  An August 2003 memorandum governing contracting procedures stated: "competition is mandatory for all Contracts"; "[r]easonable efforts will be made to obtain competitive offers by publicizing a solicitation"; "[g]rants administered under this Memorandum will not directly or indirectly benefit any Ministry, CPA or Coalition Forces official or employee involved in the contracting or grant-making process"; "[p]ersons involved in the contracting process ... shall not ... [u]se public office for private gain"; requirements on a project "may not be split to avoid the application of these rules"; and contracts for more than $500,000 were to be approved by a special "Award Committee".  See Whiteford, 676 F.3d at 352.

Wheeler and Whiteford were part of an alleged conspiracy to defraud the CPA that included six others either charged with — or who pleaded guilty to — participating: (1) Philip Bloom, an American citizen residing in Romania, who owned and managed construction companies throughout the world, including Global Business Group Logistics ("GBG Logistics"), which contracted with the CPA and the DoD for Iraqi construction

---

[3]  Whiteford, who was a colonel, participated in the bid-rigging scheme and was convicted with Wheeler for conspiracy under 18 U.S.C. § 371.  Whiteford was deployed to Iraq on active duty in September 2003.  He was appointed CPA-SC Chief of Staff, and was the second most senior person in the region after Regional Coordinator Michael Gfoeller.  As Chief of Staff, Whiteford was responsible for supervising staff, overseeing the budget, managing reconstruction projects, and serving as a liaison between the CPA and Iraqi nationals.

projects; (2) Bruce Hopfengardner, a United States Army Reserve lieutenant colonel, who served in al-Hillah from September 2003 to June 2004, was a CPA-SC operations officer, reported to Whiteford, oversaw police-related construction projects, and helped train the Iraqi police; (3) Robert Stein, a DoD contract employee, who served as CPA-SC comptroller between November 2003 and June 2004, reported to Whiteford, and had unmonitored access to the CPA's vault; (4) Debra Harrison, a United States Army Reserve lieutenant colonel residing in New Jersey and deployed to Iraq from October 2003 to July 2004, who served as a CPA-SC financial specialist and deputy comptroller directly under the chain of command of Whiteford; (5) Seymour Morris, an American citizen residing in Romania, who operated a Cyprus-based financial services business and worked closely with Bloom;[4] and (6) William Driver, the husband of Debra Harrison.  Id. at 353.

The conspiracy arose when Bloom met with Stein and Hopfengardner at CPA headquarters in Baghdad in December 2003.  Bloom agreed to pay Stein and Hopfengardner $100,000 up front and $10,000 per month, each, if they would help Bloom secure CPA-SC contracts.  Stein, as CPA-SC comptroller, could withdraw money from the vault at any point.  Hopfengardner, who oversaw security projects, could provide inside bidding information to Bloom to enable him to secure contracts.

CPA-SC officials met to discuss a police academy construction project soon after the Baghdad meeting.  Whiteford, Wheeler, Hopfengardner, and Stein were present, as

---

[4]  Morris was acquitted in the jury trial where Wheeler and Whiteford were convicted. All of these other individuals were variously charged and pleaded guilty to certain charges.  See infra note 5 and accompanying text.

were others who were not alleged co-conspirators, such as Regional Coordinator Michael Gfoeller.  It was collectively determined to divide the project into parts under $500,000, thereby enabling evasion of CPA regulations mandating that contracts exceeding $500,000 be sent to the Head of Contracting Activity for the CPA in Baghdad for review and approval.  Id. at 353–54.  Gfoeller supported the idea to avoid delays.  But the co-conspirators had personal motives, as Bloom's companies could then receive the police-academy contracts without interference from the CPA office in Baghdad.

Stein brought Wheeler into the conspiracy in January 2004.  Wheeler's position was crucial due to his intimate involvement in the CPA-SC contracting process.  Wheeler helped GBG Logistics secure about $5.5 million in contracts by developing "scopes of work" aligned with its capabilities, recommending bid modifications to help it win approval, and directing Bloom to disguise bids to hide that GBG Logistics was securing so many contracts.  Wheeler received airplane tickets, liquor, and other gifts from Bloom in exchange.  Wheeler helped smuggle money out of Iraq in July 2004; he flew to the United States with Debra Harrison on airplane tickets purchased by Bloom.  Harrison transported $330,000 in stolen CPA funds, paid Wheeler $1,000, and covered the cost of his hotels and meals.

Whiteford began receiving gifts from Bloom in February 2004, including a watch, a laptop, and $10,000 in cash to buy a business-class airplane ticket home.  These items were purchased by Bloom and given to Whiteford by Stein or Hopfengardner.  In March

5

2004, Whiteford and Bloom exchanged emails about starting an airline company in Iraq, and Bloom offered Whiteford the job of president.  Whiteford could not accept the position at that time because he was on active military duty.  But Whiteford emailed Bloom information in May 2004 for the proposed airline, including tips about airports in Iraq that would be controlled by the Iraqi government or remain under the control of the Coalition Forces, and how to apply to provide airline services.  Whiteford later asked Bloom to help in acquiring a sports car.  Also in May 2004, Whiteford accepted a business-class airplane ticket home that had been purchased by Bloom.

Stein, Hopfengardner, Wheeler, Whiteford, and others helped Bloom to obtain $8 million in CPA-SC contracts for construction of, inter alia, a police academy in al-Hillah, a Regional Tribal Democracy Center in al-Hillah, and a library in Karbala.  Stein regularly stole money from the vault of CPA-SC and gave it to Bloom, who wire-transferred the funds to foreign bank accounts.  Bloom used the stolen funds and his own finances to buy watches, laptops, airplane tickets, and cars for his co-conspirators.

Stein, Whiteford, and Hopfengardner — as the bid-rigging and contract-steering to Bloom continued — discussed forming a private security company.  To that end, Stein and Hopfengardner requisitioned weapons through CPA-SC in early 2004 for use by the proposed company after the CPA dissolved.  Stein arranged delivery of the weapons to a military base in Fort Bragg, North Carolina, where Whiteford would pick them up.  When the weapons were not ready in time, Harrison and Wheeler agreed to help.  Specifically, Wheeler and Harrison retrieved the weapons from North Carolina and drove them to

6

Stein's home when they returned to the United States in July 2004.  Stein allowed

Wheeler to keep several pistols, a machine gun, and a silencer.

Stein, Bloom, and Hopfengardner entered into plea agreements with the federal

government in 2006 and agreed to serve as cooperating witnesses against others in the

conspiracy.[5]  While plea negotiations ensued, federal authorities began to investigate

Wheeler.  In July 2005, FBI Agent Courtland Jones telephoned Wheeler and asked if he

had moved weapons from Fort Bragg to Stein's home.  Wheeler responded affirmatively.

On November 30, 2005, Wheeler met with an attorney for advice on investigation

questions.  The attorney advised him to cooperate with questioning, but to call him if he

"got stumped".  A group of federal agents, including Jones, arrived at Wheeler's home

that same day while Wheeler was standing in his driveway.  Wheeler told the agents he

had spoken with an attorney, who had instructed him to cooperate but to call if he "got

stumped".  Whiteford, 676 F.3d at 355.  The agents arrested Wheeler, handcuffed him,

and directed him to sit in their van.  After about ten minutes, the agents removed the

handcuffs and gave Wheeler an Advice of Rights form, which he signed.  The agents then

questioned Wheeler concerning the weapons from Fort Bragg.  Wheeler told the agents

that the weapons were in his bedroom closet.  Wheeler signed a form consenting to a

---

[5]  Bloom pleaded guilty to conspiracy, bribery, and money laundering, and was sentenced to 46 months in prison and ordered to forfeit $3.6 million.  Stein pleaded guilty to, inter alia, conspiracy and bribery, and was sentenced to 108 months in prison and ordered to forfeit $3.6 million.  Hopfengardner pleaded guilty to conspiracy and money laundering, and was sentenced to a 21-month prison term and ordered to forfeit $144,500.

search of his residence.  The agents searched the home, and recovered many weapons not registered in his name.  The agents then interrogated Wheeler in his kitchen for 90 minutes.  When Wheeler's daughter arrived home, the interrogation ended and Wheeler was transported to the office of the local sheriff.  Wheeler asked to call his attorney while in the car, and the agents terminated any further questioning.

A Grand Jury returned a 25-count indictment against Whiteford, Wheeler, Harrison, Morris, and Driver on February 1, 2007.  Whiteford and Wheeler were charged with conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371; bribery, in violation of 18 U.S.C. § 201(b)(2); and eleven counts of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346.  The Indictment listed the aims of the conspiracy, i.e., bribery, wire fraud, interstate transportation of stolen property, and possession and transportation of unregistered firearms.  Wheeler was also charged with interstate transportation of stolen property, in violation of 18 U.S.C. § 2314, and smuggling bulk cash, in violation of 31 U.S.C. § 5332.  See Crim. No. 07-76, dkt. 18.

Harrison and Driver were severed from the case before trial and pleaded guilty to certain offenses.  Wheeler sought to suppress his post-arrest statements and the weapons recovered from his home in a pretrial motion, which this Court denied on March 20, 2008.  The jury trial against Whiteford, Wheeler, and Morris began on September 8, 2008.  The jury returned a verdict on November 7, 2008, finding Whiteford guilty of conspiring to commit bribery and interstate transportation of stolen property, and Wheeler guilty of conspiring to commit four crimes in the Indictment.  The jury found Whiteford

8

and Wheeler not guilty of all remaining charges, and Morris not guilty of any charge.
Whiteford and Wheeler filed post-judgment motions, which this Court denied on March
20, 2009.  This Court sentenced Whiteford to imprisonment of 60 months with two years
of supervised release, and Wheeler to imprisonment of 42 months with three years of
supervised release.  Whiteford was ordered to pay $16,200 in restitution, and Wheeler to
pay $1,200.

Wheeler and Whiteford directly appealed, arguing: (1) insufficiency of the
evidence to establish participation in the conspiracy; (2) failure to grant a new trial in the
interests of justice; and (3) error in refusal to grant "use immunity" to a co-conspirator.
Wheeler also claimed error in the denial of his motion to suppress, and both Wheeler and
Whiteford challenged the sentences imposed.  The convictions and sentences as to
Wheeler and Whiteford were affirmed on April 13, 2012.  Whiteford, 676 F.3d at 351–65.

Wheeler now brings this Motion, arguing: (1) the Court lacked jurisdiction over
the criminal matter because all of his acts were extraterritorial; (2) the Court violated his
Sixth Amendment right of confrontation of witnesses against him in allowing a lab report
regarding the weapons; (3) the Court erred in denying him the right to confront the
certifying analyst of the gun lab report; and (4) appellate counsel was ineffective.  (See
dkt. 1 at 12.)  The Government responded, and Wheeler replied.  (See dkts. 17 & 19.)

## LEGAL STANDARD

A prisoner in federal custody under a federal sentence "may move the court which
imposed the sentence to vacate, set aside or correct the sentence" upon the grounds that:

9

(1) "the sentence was imposed in violation of the Constitution or laws of the United States"; (2) "the court was without jurisdiction to impose such sentence"; or (3) "the sentence was in excess of the maximum authorized by law".  28 U.S.C. § 2255(a).

A court, in considering a § 2255 motion, must accept the truth of a movant's factual allegations unless they are frivolous on the basis of the existing record.  See United States v. Booth, 432 F.3d 542, 545 (3d Cir. 2005).  A court must "give a liberal construction to pro se habeas petitions."  Rainey v. Varner, 603 F.3d 189, 198 (3d Cir. 2010).  A court may deny the motion without holding an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief".  28 U.S.C. § 2255(b).

## DISCUSSION

### A.    Jurisdictional Claims

Wheeler argues that the Court lacked jurisdiction because all of his alleged acts (except the conspiracy to possess and transport unregistered firearms offense) were extraterritorial.  Wheeler also contends that the CPA — for which he worked — was not an entity of the United States, and therefore the indictment failed to allege an offense under 18 U.S.C. § 371, which applies only to conspiracies to defraud the United States. These arguments are without merit.

### 1.    Conspiracy to Defraud the United States

Wheeler argues that: (1) the CPA promulgated its own rules and orders under Iraqi law and not the laws of the United States; and (2) the DFI was not under the custody or

10

control of the United States and its funds were "Iraq funds". (Dkt. 1 at 4.) He argues that the CPA and DFI were not American entities, and thus there was no jurisdiction to charge him under § 371 because it applies only to conspiracies to defraud the United States. The Government counters that Wheeler is barred from relitigating this issue because it was raised and rejected on direct appeal.

Section 2255 generally may not be employed to relitigate issues that were raised and considered on direct appeal. See United States v. DeRewal, 10 F.3d 100, 105 (3d Cir. 1993); United States v. Travillion, 759 F.3d 281, 288 (3d Cir. 2014) (stating issues resolved on direct appeal not reviewable unless raised to support ineffective-assistance-of-counsel claim). This matter was decided on the direct appeal brought by Wheeler, and thus this Court need not revisit his recharacterized jurisdictional claim here.

The jurisdictional argument is without merit nonetheless. The Government did not have to allege or prove that the CPA was an entity of the United States, and the argument that a conviction under § 371 requires that the United States be the "intended target of the conspiratorial scheme" has already been rejected. Whiteford, 676 F.3d at 359–60. Section 371 has both an "offenses" prong and a "defraud" prong, and only the latter requires that the conspirators intend to harm the federal government. Id. As Wheeler and Whiteford were charged, tried, and convicted of violating the offenses prong of § 371, "the status of the CPA as a U.S. entity has no bearing" here. Id. at 360. The underlying offenses for which Wheeler was "found guilty of conspiring to achieve - bribery, interstate transportation of stolen property, wire fraud, and unlawful possession of

11

weapons - do not require the United States to be the intended target of the criminal activity."  Id.  This claim will be denied.

### 2.    Extraterritoriality Claim

Wheeler argues that the Court lacked jurisdiction because the alleged conspiracy acts (except conspiracy to possess and transport unregistered firearms) occurred in Iraq. The Government counters that this claim must be denied as procedurally defaulted because Wheeler could have raised this claim on direct appeal and failed to do so.

A claim not raised on direct appeal "may not be raised on collateral review unless the petitioner shows cause and prejudice" or actual innocence.  Massaro v. United States, 538 U.S. 500, 504 (2003).  "The procedural-default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." Id.  Under the cause and prejudice standard, "a convicted defendant must show both (1) cause excusing his ... procedural default, and (2) actual prejudice resulting from the errors of which he complains."  United States v. Pelullo, 399 F.3d 197, 220–21 (3d Cir. 2005) (internal quotes and cites omitted).  A defendant must show that "some objective factor external to the defense impeded counsel's efforts to raise the claim" to establish "cause" for procedural default.  McCleskey v. Zant, 499 U.S. 467, 493 (1991) (internal quotes and cites omitted).  "Examples of external impediments which have been found to constitute cause in the procedural default context include interference by officials, a showing that

12

the factual or legal basis for a claim was not reasonably available to counsel, and ineffective assistance of counsel." Pelullo, 399 F.3d at 223 (internal quotes and cites omitted). "[F]utility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time." Bousley v. United States, 523 U.S. 614, 623 (1998) (internal quotes and cite omitted). A procedural default caused by the tactical decision of counsel, ignorance of the law or facts, or inadvertence that is short of constitutional ineffectiveness is binding on a habeas petitioner. See Murray v. Carrier, 477 U.S. 478, 485–87 (1986); see also Engle v. Isaac, 456 U.S. 107, 134 (1982) (stating where basis for "claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default").

Wheeler fails to demonstrate cause or some "external" impediment as to this jurisdictional claim. He fails to proffer any reason for not raising this claim before, during or after trial, or on direct appeal.

Wheeler also cannot show actual prejudice as to this extraterritoriality claim because it is substantively without merit. The presumption against the extraterritorial effect of legislation does not apply to "criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers, or agents." United States v. Bowman, 260 U.S. 94, 98 (1922). The Bowman criminal statute was "directed

13

generally against whoever presents a false claim against the United States, knowing it to be such, to any officer of the civil, military or naval service or to any department thereof, or any corporation in which the United States is a stockholder, or whoever connives at the same by the use of any cheating device, or whoever enters a conspiracy to do these things." Id. at 101. For this category of offenses, "to limit [a given statute's] locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home." Id. at 98.

An exercise of extraterritorial jurisdiction is appropriate when a statute targets a crime primarily involving government personnel or assets because, consistent with Bowman, the nature of the offense targeted makes the presumption against extraterritorial jurisdiction inappropriate. See, e.g., United States v. Delgado-Garcia, 374 F.3d 1337 (D.C. Cir. 2004) (holding convictions under 18 U.S.C. § 1324 for conspiracy to induce aliens to illegally enter, or to attempt to bring illegal aliens into, United States applied extraterritorially); United States v. Cotten, 471 F.2d 744 (9th Cir. 1973) (involving civilian United States citizens in Vietnam charged with conspiracy to defraud United States, in violation of 18 U.S.C. § 371, and theft of Government property, in violation of 18 U.S.C. § 641); United States v. Campbell, 798 F.Supp.2d 293 (D.D.C. 2011) (involving Australian citizen charged with soliciting bribe in violation of 18 U.S.C. § 666(a)(1)(B), for receiving more than $10,000 in federal monies related to contracts in Afghanistan funded by United States Agency for International Development).

14

Wheeler was charged and convicted of conspiracy to commit crimes against the United States under 18 U.S.C. § 371 — the same criminal statute at issue in Cotten — based on the substantive crimes of bribery (18 U.S.C. § 201), honest services wire fraud (18 U.S.C. §§ 1343, 1346), and interstate or international transportation of stolen property (18 U.S.C. § 2314).[6]  The bribery aspect of the conspiracy to secure contracts from the CPA, which was funded by Congressional appropriations, necessarily implicates a crime against the United States regardless of whether the relevant conduct occurred in Iraq.  See Cotten, 471 F.2d at 750 (holding "Bowman implicitly gives extraterritorial effect to 18 U.S.C. § 371").  Therefore, the extraterritoriality claim is without merit because 18 U.S.C. § 371 is not subject to the presumption against extraterritorial jurisdiction based on the nature of the alleged substantive offenses as crimes against the United States.

Wheeler also argues that his alleged acts fall under the Uniform Code of Military Justice for DoD service members, and not under federal criminal law.  "[S]imply because a member of the armed forces may be punished by military court martial for an offense provides no justification for concluding that a District Court lacks jurisdiction to punish him for the same offense, if such offense is violative of a federal law."  United States v. Walker, 552 F.2d 566, 567 (4th Cir. 1977); see Grafton v. United States, 206 U.S. 333, 348 (1907) (holding federal courts have concurrent jurisdiction with military courts over

---

[6]  Wheeler's conviction of possession of unregistered firearms in violation of 26 U.S.C. § 5861(d) is not the subject of his extraterritoriality argument because the firearms were in his possession in the United States.  Further, except for the bribery conduct, most of the relevant conduct related to the other substantive offenses occurred in the United States.

violations of American law by military personnel); see also 18 U.S.C. § 3231 ("The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States. Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof.").  Moreover, Wheeler was no longer in military service when the investigation occurred and the Indictment was issued.  This jurisdictional claim by Wheeler is without merit.

**B.      The ATF Report and Confrontation Clause Claims**

Wheeler contends that the Court erred in admitting a report by the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF Report") regarding testing performed on the firearms and silencers seized from Wheeler and his co-conspirators.  The testing confirmed that the seized firearms were subject to the registration requirements under 26 U.S.C. § 5841.  Wheeler contends that the admission of the ATF Report, and the testimony of the certifying analyst (who did not prepare the ATF Report), rather than the analyst who conducted the testing, violated his Sixth Amendment right to confront the person who had prepared it.  Wheeler also claims that his appellate counsel was ineffective for refusing to file a letter raising the decision in Bullcoming v. New Mexico, 131 S.Ct. 2705 (2011), on direct appeal as a supplemental authority pursuant to Federal Rule of Appellate Procedure 28(j).

The Government argues in response:  (1) Wheeler waived his right to confront the witness against him when his counsel stipulated to the admission of the ATF Report at

16

trial; (2) Wheeler is now barred from raising a violation of the Confrontation Clause here because he did not raise the claim on direct appeal; (3) the stipulation to admit the ATF Report is not excused by an intervening change in the law; (4) the decision by counsel not to raise the claim on direct appeal does not constitute ineffectiveness and thus does not provide cause to excuse the failure to challenge the ATF Report at trial; and (5) prejudice cannot be shown given the substantial weight of evidence establishing that the firearms were subject to the registration requirements of 26 U.S.C. § 5841.

### 1. Stipulation by Counsel Operates as Waiver of Confrontation Clause Rights

The stipulation by trial counsel for Wheeler operated as a waiver of his Confrontation Clause rights.  His trial counsel stipulated to the admission of the ATF Report at trial, and he made no objection regarding the testimony of Special Agent William Baudhuin as to the ATF Report.[7]  Therefore, Wheeler's rights under the Confrontation Clause were not violated.  See United States v. Merchant, 376 Fed.Appx. 172, 178 (3d Cir. 2010) (finding admission of lab reports concluding that drugs sold by defendant during controlled buys were cocaine, without live testimony from analysts who wrote them, did not violate Confrontation Clause, given defendant's stipulation that reports could be admitted without further testimony or proof); Fakhouri v. Thompson, No. 12-756, 2014 WL 4165635, at *23 (M.D. Pa. Aug. 20, 2014).

---

[7] The only objections made by trial counsel for Wheeler regarding the testimony of Baudhuin involved a hearsay objection concerning how some weapons were ordered and shipped, and an objection based on a failure by the Government to provide counsel with the written summary of expert testimony intended to be offered at trial.  (Dkt. 16, Answer at 12 n.3.)

Any contention that the stipulation by counsel concerning the ATF Report was not a valid waiver under the Confrontation Clause because Wheeler did not personally waive the right is without merit; a personal waiver is not required.  United States v. Williams, 403 Fed.Appx. 707, 708 (3d Cir. 2010) (citing Janosky v. St. Amand, 594 F.3d 39, 48 (1st Cir. 2010); United States v. Plitman, 194 F.3d 59, 64 (2d Cir. 1999); United States v. Stephens, 609 F.2d 230, 232–33 (5th Cir. 1980); United States v. Cooper, 243 F.3d 411, 418 (7th Cir. 2001); United States v. Gamba, 541 F.3d 895, 900–01 (9th Cir. 2008); and United States v. Aptt, 354 F.3d 1269, 1282 (10th Cir. 2004).)  The stipulation by counsel for Wheeler as to the ATF Report and the testimony of Special Agent Baudhuin constituted a waiver of his rights under the Confrontation Clause.

### 2.  Confrontation Clause Is Procedurally Defaulted

Wheeler also is procedurally barred from raising this Sixth Amendment claim for the first time here because he did not raise it on direct appeal.  If a defendant procedurally defaults on a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or actual innocence.  Bousley, 523 U.S. at 622.  Wheeler argues that the Bullcoming decision represents an intervening change in the law sufficient to establish cause for not raising this claim on direct appeal.  He also appears to argue that the ineffective assistance of his appellate counsel in failing to raise this issue on direct appeal is cause for a procedural default.  See Murray, 477 U.S. at 488.  This Court rejects both arguments and finds that Wheeler cannot establish cause for his procedural default.

18

### a. Intervening Change in the Law

Wheeler contends that the 2011 <u>Bullcoming</u> decision represents an intervening change in the law sufficient to establish cause for the failure to raise the claim on direct appeal. <u>Bullcoming</u> held that the admission of a lab report concluding that defendant's blood alcohol content was above the legal driving limit, without the in-court testimony of the analyst who had prepared the report, amounted to a violation of the Confrontation Clause. <u>See</u> 131 S.Ct. at 2717.

But the Government argues that the notion that the admission of a forensic report could violate the Confrontation Clause was not a novel claim or reasonably unavailable to Wheeler at the time of his 2008 trial, and thus he cannot show an intervening change in the law to establish cause for his default in raising the claim at trial. This Court agrees. Indeed, in 2004, well before Wheeler's trial began, the Supreme Court held that testimonial statements of witnesses absent from trial could violate the Confrontation Clause of the Sixth Amendment. <u>Crawford v. Washington</u>, 541 U.S. 36 (2004).

Six months before Wheeler's trial began, moreover, the Supreme Court granted certiorari on the issue of whether admission of a forensic report could violate the Confrontation Clause. <u>See</u> <u>Melendez-Diaz v. Massachusetts</u>, 552 U.S. 1256 (2008). In June 2009, the Supreme Court eventually ruled that the admission of a narcotics lab report without the in-court testimony of the preparing analyst violated the Confrontation Clause. <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. 305, 325 (2009). Further, the Court noted that

"[m]any States have already adopted the constitutional rule we announce today, while many others permit the defendant to assert (or forfeit by silence) his Confrontation Clause right after receiving notice of the prosecution's intent to use a forensic analyst's report". Id. at 325–26 (footnote omitted).

There are also several federal circuit court cases that were issued before Wheeler's trial in which the admissibility of forensic reports were challenged on Confrontation Clause grounds.  See, e.g., United States v. Washington, 498 F.3d 225 (4th Cir. 2007); United States v. Springer, 165 Fed.Appx. 709 (11th Cir. 2006); United States v. Feliz, 467 F.3d 227, 228 (2d Cir. 2006); Sherman v. Scott, 62 F.3d 136 (5th Cir. 1995); Manocchio v. Moran, 919 F.2d 770 (1st Cir. 1990).  Thus, this Court finds that Wheeler cannot plausibly argue that his Confrontation Clause challenge was so novel or legally unavailable at the time of trial so as to establish cause for his procedural default based on an intervening change in the law.

### b.  Ineffective Assistance of Counsel

Wheeler argues that his appellate counsel was ineffective for failing to raise this Confrontation Clause violation on direct appeal.  The Sixth Amendment guarantees that the accused shall enjoy the right to have the assistance of counsel for the defense in all criminal prosecutions.  Wheeler must show deficient performance and resulting prejudice as set forth in Strickland v. Washington, 466 U.S. 668 (1984), to succeed here.  See Premo v. Moore, 562 U.S. 115 (2011) (holding that to establish ineffective assistance of

counsel, defendant must show both deficient performance by counsel and prejudice).

Wheeler must show that the performance of counsel (viewed as of the time of the conduct

of counsel) was inadequate and "fell below an objective standard of reasonableness," in

that "counsel made errors so serious that counsel was not functioning as the 'counsel'

guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687–88.

Wheeler must then show that the deficient performance prejudiced the defense.  In other

words, Wheeler must prove that there was "a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the

outcome." Id. at 694; see also Rainey, 603 F.3d at 197–98.

     "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky,

559 U.S. 356, 371 (2010).  The "Strickland standard must be applied with scrupulous

care", because an "ineffective-assistance claim can function as a way to escape rules of

waiver and forfeiture and raise issues not presented at trial". Harrington v. Richter, 562

U.S. 86, 105 (2011).  "It is all too tempting to second-guess counsel's assistance after

conviction or adverse sentence", but "[t]he question is whether an attorney's

representation amounted to incompetence under prevailing professional norms, not

whether it deviated from best practices or most common custom." Id. (internal quotes

and cites omitted).  In determining whether the stipulation in this case was "objectively

reasonable," this Court is bound by the express warning set forth in Strickland against

using hindsight to second-guess the tactical decisions of counsel.  Strickland, 466 U.S. at 689.

Wheeler must show, with reasonable probability, that but for the professional incompetence of counsel, the outcome of the proceeding would have been different in order to establish the prejudice part of an ineffective assistance of counsel claim.  Id. at 694.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.  Virtually every act or omission of counsel would meet that test."  Id. at 693.

"Claims of ineffective assistance of appellate counsel are also governed by the Strickland standard."  Lusick v. Palakovich, 270 Fed.Appx. 108, 110 (3d Cir. 2008).  But it is the responsibility of counsel on appeal to decide which issues to raise, and counsel does not have an obligation to raise every potentially meritorious claim.  Jones v. Barnes, 463 U.S. 745, 751–52 (1983).  Thus, a choice not to pursue an issue on appeal that the defendant would like to raise is not, on its own, a basis for an ineffective assistance of counsel claim.  Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir. 1996).

The record here unequivocally shows that trial counsel stipulated to the admission of the ATF Report, and thus Wheeler waived his right to confront the person who had prepared it.  As discussed above, a stipulation by counsel to the admission of a lab report operates as a valid waiver of the Confrontation Clause rights of a defendant, and cannot be raised on appeal.  See Virgin Islands v. Rosa, 399 F.3d 283, 290 (3d Cir. 2005); see

22

also Merchant, 376 Fed.Appx. at 178; Williams, 403 Fed.Appx. at 708. Moreover, a personal waiver is not required. Id. Thus, on these facts, Wheeler has failed to demonstrate that he received ineffective assistance of appellate counsel, and accordingly cannot show cause to excuse the failure at trial to challenge the ATF Report.

Wheeler also fails to demonstrate that appellate counsel was "unreasonable" in not arguing that the decision of this Court to admit the ATF Report was plain error. See United States v. Underwood, 246 Fed.Appx. 92, 95 (3d Cir. 2007) (holding that when petitioner fails to preserve admissibility issue for appeal, the district court's decision to admit evidence is reviewed for plain error). Indeed, a decision by counsel to stipulate to evidence and thereby waive the confrontation rights of a client is "a legitimate trial tactic and part of a prudent trial strategy as long as the decision does not constitute ineffective assistance of counsel." See Williams, 403 Fed.Appx. at 709. In this case, neither Wheeler nor any of his co-defendants challenged the conclusions in the ATF Report or objected to their admission. Moreover, Wheeler presents no argument, and the record is barren of any evidence, to rebut the ATF Report in any way. Wheeler has not shown any evidence that the firearms were not covered by the registration requirements under 26 U.S.C. § 5841. More importantly, nothing in the record suggests that counsel for Wheeler had any evidence with which to cross-examine or rebut the technician who prepared the ATF Report sufficient to undermine the credibility or admissibility of the report. Accordingly, the claim of ineffectiveness of appellate counsel is without merit.

### c. Wheeler Cannot Show Actual Prejudice

Wheeler fails to demonstrate the actual prejudice necessary to overcome any procedural default regarding the failure to challenge the ATF Report at trial.  As noted above, in order to obtain collateral review on his procedurally defaulted claim, Wheeler must show either cause for the procedural default and actual prejudice, or that he is actually innocent.  See Parkin v. United States, 565 Fed.Appx. 149, 151 (3d Cir. 2014) (citing Bousley, 523 U.S. at 622).  Prejudice exists where errors at trial "worked to [petitioner's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  United States v. Frady, 456 U.S. 152, 170 (1982).  To show actual prejudice after proving cause, Wheeler must show a reasonable probability that the result of the trial would have been different if the claimed errors in procedural default had not occurred.  Strickler v. Greene, 527 U.S. 263, 283 (1999).

The Government argues here that even if the ATF Report had not been admitted at trial, there was other substantial and overwhelming uncontested evidence establishing that the weapons obtained from Wheeler's residence were indeed subject to the registration requirements of 26 U.S.C. § 5841.  For instance, Special Agent Baudhuin testified at trial as to his own examination of the firearms recovered, specifically noting that the overall length, the barrel length, the appearance, the sights, the receivers, the safeties, the selector switches, and the movement of the actions in combination confirmed for him that the rifles in question were, in fact, machine guns.  (See 10-2-08 Trial Tr., vol. XII at 181–83, 194–96, 200–01.)  Baudhuin also testified that the firearms were marked as "restricted

24

government law enforcement use only," and that such a marking is a "giveaway" that the weapon "has to be registered either with a law enforcement entity or with the United States government." (Id. at 181–83.) Baudhuin further testified that the silencer was in a box labeled "sound suppresser," and that he confirmed this information by observing the shape, threading, and the "ports" built into the interior of the device. (Id. at 187–90.) Additionally, based on the serial numbers on the firearms, other documents admitted at trial established that they were registered to the United States Army as machine guns. (See dkt. 16-3 at 32–43 (originally Exhibit G-2); 9-15-08 Trial Tr., vol. V at 40–43 (stipulating to admission of Exhibit G-2).)[8]

Based on the testimony of Baudhuin concerning his own examinations and findings, and other evidence, Wheeler cannot demonstrate that the admission of the conclusions of the ATF Report without the in-court testimony of the preparer worked to his "actual and substantial disadvantage". See Frady, 456 U.S. at 170. Consequently, Wheeler has failed to satisfy the prejudice part of the procedural default analysis.

## CERTIFICATE OF APPEALABILITY

This Court will deny a certificate of appealability because Wheeler has not demonstrated "a substantial showing of the denial of a constitutional right" as required under 28 U.S.C. § 2253(c)(2). See Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

---

[8] The documents also establish that Exhibit G-6 was registered to the Army as a silencer. (See dkt. 16-3 at 44.)

## CONCLUSION

This Court will deny the Motion and decline to issue a certificate of appealability.

The Court will issue an appropriate order.

  s/ Mary L. Cooper

**MARY L. COOPER**
United States District Judge

Dated:  May 13, 2015